# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# LOUISVILLE DIVISION
# CRIMINAL ACTION NO. 3:20-MJ-762

**UNITED STATES OF AMERICA**                                                                     **PLAINTIFF**

**VS.**

**STEFANY L. WALLACE**                                                                                    **DEFENDANT**

## MEMORANDUM OPINION AND ORDER

On April 30, 2021 and May 3, 2021, this Court held a two-day bench trial in the matter of United States v. Stefany L. Wallace at the Gene Snyder Courthouse in Louisville, Kentucky. Defendant Wallace was charged by information with operating and being in physical control of a motor vehicle while under the influence of alcohol in violation of KRS § 189A.010(1)(b)(5)(a)[1] and the Federal Assimilative Crimes Act, 18 U.S.C. §§ 7, 13. *See* (DN 1). At the conclusion of the bench trial, the undersigned took the case under advisement to review the transcript and the evidence presented. Additionally, during the trial, Defendant Wallace objected to the United States' witness, Dr. James Stephens, certification as an expert witness. The Court deferred ruling on the objection and indicated that it would be addressed at the conclusion of the trial. The matter is now ripe for ruling.

---

[1] KRS § 189A.010(1)(b) reads in relevant part: "[a] person shall not operate or be in physical control of a motor vehicle anywhere in the state. . . [w]hile under the influence of alcohol." Section (5)(a) provides "[a]ny person who violates the provisions of paragraph (a), (b), (c), (d), or (e) of subsection (1) of this section shall. . . [f]or the first offense within a ten (10) year period, be fined not less than two hundred dollars ($200) nor more than five hundred dollars ($500), or be imprisoned in the county jail for not less than forty-eight (48) hours nor more than thirty (30) days, or both. Following sentencing, the defendant may apply to the judge for permission to enter a community labor program for not less than forty-eight (48) hours nor more than thirty (30) days in lieu of fine or imprisonment, or both. If any of the aggravating circumstances listed in subsection (11) of this section are present while the person was operating or in physical control of a motor vehicle, the mandatory minimum term of imprisonment shall be four (4) days, which term shall not be suspended, probated, conditionally discharged, or subject to any other form of early release[.]"

Background

On November 8, 2019, at approximately 11:00 A.M., Defendant Stefany L. Wallace ("Ms. Wallace") started her day at brunch where she had a glass of wine and a beer. (DN 24, at p. 22). From there, she had plans to go to Otter Creek Tavern with her two friends, Melissa Bell ("Ms. Bell") and Diana Stallard ("Ms. Stallard"). (DN 22, at pp. 140-41, 152-53; DN 24, at pp. 21-22). Ms. Bell and Ms. Stallard arrived to pick Ms. Wallace up from her house at approximately 5:30 P.M. and the group proceeded to Otter Creek Tavern in Ms. Bell's vehicle. (DN 22, at p. 141-43, 152-153; DN 24, at pp. 22-23).

Once at Otter Creek Tavern, the trio ordered dinner and drinks. (DN 22, at pp. 141-43, 152-53; DN 24, at pp. 22-23). Ms. Wallace testified that she drank two beers at the tavern, one before dinner and one with dinner. (DN 24, at pp. 22-23, 25). The group stayed at the tavern for approximately three and half hours before deciding to go to another bar called The Shop. (DN 22, at pp. 143, 153-54; DN 24, at pp. 23-25). Ms. Stallard drove the group to The Shop because it was storming, and Ms. Bell has trouble seeing at night due to her night blindness. (*Id.*).

Once at The Shop, both Ms. Wallace and Ms. Bell ordered another beer. (DN 22, at pp. 143-44, 154-55; DN 24, at pp. 24-25). According to Ms. Wallace's testimony, however, she only had time to take two sips of her beer before the group decided to leave and go to Sam Adams, a bar located on base at Fort Knox, Kentucky. (*Id.*). Ms. Stallard drove the group on post, but when they arrived at Sam Adams, they realized the bar was closed. (*Id.*). It was at this point that Ms. Wallace decided to get behind the wheel of Ms. Bell's vehicle and give the group a tour of the base. (DN 22, at pp. 144-46, 155-56; DN 24, at pp. 24-27).

2

Ms. Wallace first wanted to show her friends the helicopters that her boyfriend Chris flies, so she drove the group less than a mile up the road and parked the vehicle in front of Fort Knox's Reserve Command Building. (*Id*.). Both Ms. Stallard and Ms. Bell testified that Ms. Wallace did not show any signs of being "under the influence" while driving the vehicle. (DN 22, at pp. 145, 147, 156). Ms. Bell even went on to say that "[i]f I thought for one moment that she was under the influence and could not drive my vehicle. . . I would not have her driving." (*Id*. at pp. 158-59).

The group had only been parked for a few minutes when Lieutenant Andrew Short ("Lieutenant Short"), a Fort Knox Police Supervisor, spotted the vehicle as he was in route to a possible DUI. (*Id*. at pp. 7-8, 11-12, 146, 156-57; DN 24, at pp. 27-28). Concerned that the occupants of the vehicle needed assistance, Lieutenant Short activated his lights and pulled over to investigate. (DN 22, at p. 12). Lieutenant Short then approached the vehicle and made contact with the driver, Ms. Wallace. (*Id*. at pp. 12-13). Lieutenant Short noted that the vehicle was in idle, the lights were on, and that there were two additional passengers inside. (*Id*. at pp. 13-14). Lieutenant Short asked Ms. Wallace if she needed assistance and she explained that "she had been riding around with her friends on the installation showing them where she used to work." (*Id*. at pp. 12-14). At this point, Lieutenant Short noticed a "strong smell of alcohol emanating from the vehicle." (*Id*. at p. 14). He then asked Ms. Wallace for her driver's license and identification card, but she was unable to immediately locate them. (*Id*.). While Ms. Wallace searched for her driver's license, Lieutenant Short returned to his vehicle and informed the other officer on scene that he intended to separate Ms. Wallace from the vehicle to determine the source of the odor. (*Id*. at pp. 14-15).

After verifying her information, Lieutenant Short returned to the vehicle and asked Ms. Wallace to exit the vehicle. (*Id*. at p. 15; DN 24, at p. 28). Lieutenant Short testified that he did not

observe any signs of impairment as Ms. Wallace exited the vehicle. (DN 22, at pp. 15-16). Once outside the vehicle, however, Lieutenant Short determined that the odor of alcohol was indeed coming from Ms. Wallace. (*Id*. at p. 15). Lieutenant Short then asked her if she had been drinking. (*Id*. at pp. 16-17). She replied that she had a glass of wine and a beer and that she had last drank between the hours of 6:00 and 7:00 P.M..[2] (*Id*.). Because Ms. Wallace stated that she had consumed alcohol, Lieutenant Short then asked Ms. Wallace if she would be willing to perform a series of Standard Field Sobriety Tests ("SFSTs") to determine her "level of sobriety." (*Id*. at pp. 17-18). Ms. Wallace agreed. (*Id*.).

The first test Lieutenant Short administered was the horizontal gaze nystagmus test ("HGN"). (*Id*.). Ms. Wallace did not exhibit any clues of being under the influence while performing the HGN test. (*Id*. at p. 21). Next, Lieutenant Short decided to check Ms. Wallace breath for the presence of alcohol with a portable breath test ("PBT"). (*Id*.). Lieutenant Short testified that normally an officer would administer all three SFSTs before asking an individual to submit to a PBT, but he felt that the situation warranted a deviation from protocol. (*Id*. at pp. 24-25). He testified that because Ms. Wallace was not exhibiting "typical indicators of a person who is impaired[,]" he administered the SFSTs out of order to see if he could save her from having to perform the other, more invasive tests. (*Id*. at pp. 24-25). Lieutenant Short went on to say that he did not initially believe Ms. Wallace was impaired but wanted to "double-check" before he allowed her to return to the road. (*Id*. at pp. 21, 24-25).

On her first attempt Ms. Wallace was unable to produce enough breath to render a valid sample from the PBT. (*Id*. at pp. 23-24). On her second attempt, she was successful and the PBT

---

[2] When asked on cross examination why she had not told the Lieutenant Short about the additional beers she had consumed that evening, Ms. Wallace stated that she was going to tell him, but that Lieutenant Short did not let her finish telling him about her evening. (DN 24, at pp. 30-31).

4

indicated the presence of alcohol. (*Id*. at p. 24). Lieutenant Short then decided it was necessary for Ms. Wallace to perform the two remaining SFSTs, the walk and turn test and the one-leg stand test. (*Id*. at pp. 25, 28).

Lieutenant Short testified that typically, when an individual performs the walk and turn test, she or he is asked to balance and take nine heel-to-toe steps along a straight line. (*Id*. at p. 26). Ideally, this test should be done on a flat surface and the individual should be wearing proper footwear. (*Id*. at pp. 25-26). In Ms. Wallace's case, she was wearing high heel boots, so Lieutenant Short informed her she could either remove her boots or they could go back to the station where she could perform the tests in a controlled environment. (*Id*.). Ms. Wallace opted to remove her boots and perform the test in her socked feet. (*Id*.).

There are a total of seven possible clues that an individual could display during the walk and turn test, Ms. Wallace displayed five of the seven clues. (*Id*. at p. 27). Lieutenant Short then asked Ms. Wallace to perform the one-leg stand test. (*Id*. at p. 28). Ms. Wallace displayed three out of the possible four clues during this test. (*Id*. at p. 29). At the conclusion of the SFSTs, Lieutenant Short testified that he changed his initial opinion and determined that Ms. Wallace was impaired. (*Id*. at p. 29). He then informed Ms. Wallace that he would need to take her back to the police station where she would be read the implied consent warning, be observed for the twenty minute observation period, and be placed on the Intoxilyzer instrument to check her breath alcohol content. (*Id*. at pp. 29-30).

Once at the station, Ms. Wallace agreed to provide an additional breath sample, however, when she was placed on the Intoxilyzer instrument she was unable to provide a sufficient sample. (*Id*. at pp. 35, 37, 39). The Intoxilyzer instrument rendered a ticket which read: "deficient sample with alcohol present." (*Id*. at p. 39). Lieutenant Short then requested Fort Knox EMS to come to

the station to conduct a blood draw. (*Id*. at pp. 39, 64). Ms. Wallace's blood sample was processed and sent to the Kentucky State Police Jefferson Forensic Laboratory where it was determined that the alcohol contend of her blood was .078. (*Id*. at pp. 64-67, 80-81).

Ms. Wallace was subsequently charged by information with operating and being in physical control of a motor vehicle while under the influence of alcohol at Fort Knox, Kentucky in violation of KRS § 189A.010(1)(b)(5)(a) and the Federal Assimilative Crimes Act, 18 U.S.C. §§ 7, 13. (DN 1). This offense is a class B misdemeanor and carries a fine of not less than $200 and not more than $500, or imprisonment of not less than forty-eight hours and not more than thirty days, or both. *See* KRS § 189A.010(5)(a).

The two-day bench trial in the case took place on April 30, 2021 and May 3, 2021. During the trial, the United States presented four witnesses: Lieutenant Andrew Short, Fort Knox Paramedic Freddie George, Kentucky State Police Forensic Analyst Dena Fletcher, and Dr. James Stephens. Defendant Wallace's counsel then presented five witnesses on her behalf: Diana Stallard, Melissa Bell, retired Louisville Police Officer Raymond Sutherland, Defendant Wallace, and Dr. Harry Plotnick. At the conclusion of the bench trial, the undersigned took the case under advisement to review the transcript and evidence of guilt presented by the United States and to assess Dr. Stephens' qualifications to testify as an expert witness in the fields of forensic toxicology and human performance. The Court will address each issue in turn.

## Dr. Stephens' Qualification as an Expert

The Court will first address Ms. Wallace's objection to Dr. James Stephens' (Dr. Stephens") certification as an expert witness. *See* (DN 22, at p. 97). Rules 702 and 104(a) of the Federal Rules of Evidence govern the admissibility of expert testimony. *See Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 250 (6th Cir. 2001) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509

U.S. 579, 589 (1993)). Rule 702 allows opinion testimony by a "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education" if the testimony satisfies the following four conditions:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. As such, the trial judge is tasked with acting as a "gatekeeper" to ensure that expert testimony is both reliable and relevant. *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 429 (6th Cir. 2007) (citing *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147 (1999)).

Expert testimony is relevant when it assists the trier of fact in understanding the evidence or determining a material fact in question. *See Daubert*, 509 U.S. at 591–93. When deciding whether an expert's opinion is reliable, the Court should determine if the opinion rests "upon a reliable foundation, as opposed to, say, unsupported speculation." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529-30 (6th Cir. 2008). "The party offering the expert's testimony has the obligation to prove the expert's qualifications by a preponderance of the evidence." *Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 376 (6th Cir. 2014). Here, Defendant Wallace argues both that Dr. Stephens is not qualified to give the proposed expert opinion testimony and that his proposed testimony is irrelevant. (DN 22, at pp. 86, 94-96, 97, 103).

The Court will first examine Dr. Stephens' qualifications.[3] The Court does "not consider 'the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question.'" *Burgett*, 579 F. App'x at 376 (quoting

---

[3] Because Dr. Stephens' Curriculum Vitae was not submitted for the Court's consideration, the undersigned will rely solely on Dr. Stephens' testimony about his professional background.

7

*Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)). "Under the Federal Rules of Evidence, the only thing a court should be concerned with in determining the qualifications of an expert is whether the expert's knowledge of the subject matter is such that his opinion will likely assist the trier of fact in arriving at the truth." *Mem'l Hall Museum, Inc. v. Cunningham*, 455 F. Supp. 3d 347, 365 (W.D. Ky. 2020) (quoting *Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 851 (6th Cir. 1981)). The expert's qualifications, however, must match up with the exact subject matter about which the expert proposes to testify. *See Elswick v. Nichols*, 144 F. Supp. 2d 758, 766 (E.D. Ky. 2001), *aff'd sub nom. Elswick v. Pikeville United Methodist Hosp. of Ky., Inc.*, 50 F. App'x 193 (6th Cir. 2002). In this case, Dr. Stephens seeks to offer an opinion that Ms. Wallace's blood alcohol concentration in connection with the results of her SFSTs demonstrate that she was under the influence of alcohol on the night in question. (DN 22, at pp. 94, 96, 98-99, 104).

The United States argued that Dr. Stephens' experience as both an internal physician and a medical review officer is sufficient qualification for the proposed testimony. (*Id*. at pp. 96-99, 102-04). As a medical review officer, Dr. Stephens is certified and trained in evaluating causes for a "nonnegative" test of drugs and alcohol. (*Id*. at p. 93). Meaning, he is tasked with determining if there is a medical reason causing an abnormality on a patient's drug or alcohol screening. (*Id*. at pp. 93, 101-03). Additionally, the United States alleged that Dr. Stephens can opine on human performance at a 0.078 blood alcohol level because he has studied the effect of alcohol on the human body. (*Id*. at pp. 99-100).

In response, Ms. Wallace, through defense counsel, argued that Dr. Stephens' proposed expert opinion goes against his medical training. (*Id*. at pp. 97, 101, 103). Typically, Dr. Stephens, as a medical review officer, is asked to look for a medical reason to explain an abnormal result on a patient's drug or alcohol screening. (*Id*.). Here, however, he is proposing to do the exact opposite.

8

(*Id*.). Defense counsel alleged that if Dr. Stephens proposed expert opinion was to say, "there's no medical reason. . . to explain that 0.78. . .that would be fine[.]" (*Id*. at p. 103). But in this case, Dr. Stephens is seeking to opine on whether or not Ms. Wallace was under the influence of alcohol, which defense counsel contends, goes beyond Dr. Stephens' training. (*Id*. at pp. 97, 101, 103). Defense counsel also noted that Dr. Stephens is not trained in the administration of SFSTs but is seeking to offer an opinion based on those results. (*Id*. at p. 97).

After a thorough review of Dr. Stephens' qualifications as they relate to his proposed testimony, the Court finds that Dr. Stephens is not credible to testify as an expert witness in this matter. While it is true that Dr. Stephens' background as Chief of Public Health and Preventive Medicine for Fort Knox, Kentucky and his certification as a medical review officer may qualify him to testify as an expert witness on some issues, his testimony in this case exceeds the scope of his expertise. *See* (*Id*. at pp. 91-93). Additionally, Dr. Stephens' lack of formal education and training on the issue is not made up for in experience. Dr. Stephens' has never testified on this issue before, and while that in of itself does not preclude his testimony, it is persuasive. *See* (*Id*. at p. 96). Finally, in his role as a medical review officer, Dr. Stephens typically reviews an individual's history to determine if there is a medical reason for the findings of the lab test. *See* (*Id*. at pp. 93, 101-103). Here Dr. Stephens did not interview Ms. Wallace or review any of her relevant medical history. *See* (*Id*. at p. 103). He simply examined Ms. Wallace's blood alcohol results and sought to correlate that finding with her performance on the SFSTs to determine if she was "under the influence" of alcohol. The Court, therefore, finds that Dr. Stephens is not qualified to offer an expert opinion on this matter.

Additionally, Dr. Stephens' opinion is inadmissible under Rule 702 because it is not relevant. As noted above, expert testimony is relevant when it assists the trier of fact in

understanding the evidence or determining a material fact in question. *See Daubert*, 509 U.S. at 591–93. The relevant question before the Court is whether or not Ms. Wallace was under the influence of alcohol on the night in question. As such, the Court finds that Dr. Stephens' proposed testimony does not assists the trier of fact in understanding the evidence or determining a material fact at issue. The Court, therefore, will not consider Dr. Stephens' testimony in its decision.

Analysis

Ms. Wallace was charged with operating and being in physical control of a motor vehicle while under the influence of alcohol in violation of KRS § 189A.010(1)(b)(5)(a) and the Federal Assimilative Crimes Act, 18 U.S.C. §§ 7 and 13. Taken together, these two statutes require proof, beyond a reasonable doubt, that Ms. Wallace was: (1) in operation or physical control of a motor vehicle; (2) on Fort Knox, Kentucky, a special maritime and territorial jurisdiction of the United States on or about November 9, 2019; and (3) was under the influence of alcohol. *See* KRS § 189A.010(1)(b); 18 U.S.C. §§ 7, 13; *see also Bridges v. Commonwealth*, 845 S.W.2d 541, 542 (Ky. 1993). The parties only dispute the third element – whether Ms. Wallace was under the influence of alcohol.

The question then becomes: what does it mean to be "under the influence" pursuant to KRS § 189A.010(1)(b)? While there is no specific statutory definition of these words, the Court looks to case law to guide its analysis. An old Kentucky Court of Appeals case dealing with insurance liability, *Campbell v. Fidelity & Casualty Co. of New York*, discussed the phrase in great detail:

> 'while under the influence of or affected by intoxicants,'... is clearly susceptible of two interpretations. Strictly and literally, it would include being under the influence of liquor to any extent; and, as aptly said by one of the witnesses, 'when you take one, you are under it some, and when you take two, more.' But in ordinary acceptation it does not mean that. It means being so far under the influence as to constitute a state of intoxication. . . .

60 S.W. 492, 495-96 (1901). The Court goes on to explain:

> [I]t is not necessary … that [he] should be so far under the influence of intoxicants as to be in what is ordinarily termed a state of intoxication or drunkenness, but only so far under the influence of or affected by them that the incapacity, nervous or mental, or the excitement of passion, should be such that the injury results in consequence of it.

*Id*. at 497. The Kentucky Supreme Court has also given guidance on what it means to be "under the influence" of alcohol. In *Bridges*, the Kentucky Supreme Court granted review of Bridges' conviction for operating a vehicle while under the influence of alcohol in order to determine if the trial court erred by including among its jury instructions a definition of "under the influence." [4] *Bridges*, 845 S.W.2d at 541. The Court ultimately held that the instruction was improper because it equated "'under the influence' with mere consumption." *Id*. at 542. The Court reasoned that the jury instruction essentially re-wrote the statute "so as to incriminate any person who drives after having consumed any amount of alcohol at any time[,]" rather than the statute's intended purpose to "prevent the evil effects of substandard driving resulting from the operation of motor vehicles by persons under the influence of alcohol." *Id*. As a result, the Court decided that no jury instruction should be given to define "under the influence" because the statute itself is sufficient. *Id*. at 543.

Next, the Court considers a similar case at Fort Campbell in which Judge Russell upheld the Magistrate Judge's conviction of a defendant charged with, among other things, driving under the influence in violation of 18 U.S.C. § 13. *See United States v. Hendrix*, No. 5:10-CR-00017, 2011 WL 754888, at *1 (W.D. Ky. Feb. 24, 2011). In this case, Judge Russell held that there was sufficient evidence to support a finding, by a rational trier of fact, that the defendant was under the

---

[4] At the time this case was decided KRS 189A.010(1) stated: "[n]o person shall operate a motor vehicle anywhere in this state while under the influence of alcohol or any other substance which may impair one's driving ability." *See Bridges*, 845 S.W.2d at 541.

influence of alcohol. *Id*. at *4. In coming to this conclusion, Judge Russell considered the following evidence: (1) testimony from three separate individuals that the defendant smelled strongly of alcohol; (2) the fact that the defendant had difficulty walking, was belligerent, and was slurring her speech; (3) the defendant's performance on two field sobriety tests; (4) the fact that the defendant refused to submit to a breathalyzer test; and (5) that the defendant admitted to drinking and taking prescription drugs. *Id*. In contrast, the only evidence offered to refute this evidence was testimony from an individual who had a brief encounter with the defendant and stated he did not notice anything "unusual," the defendant's own testimony that she was not intoxicated, and the fact that the defendant's implied consent form was filled out properly and legibly. *Id*. Judge Russell held that the evidence presented was sufficient to support a finding beyond a reasonable doubt that the defendant was under the influence of alcohol while she was in physical control of a motor vehicle. *Id*. With that in mind, the Court now turns to the evidence before it in this case.

In order to prove that Ms. Wallace was under the influence of alcohol, the United States heavily relied on the subjective findings of Lieutenant Short coupled with the results of Ms. Wallace's blood alcohol test. According to the United States, "under the influence is not even impairment. . . .[I]t's a lower standard. It is not a specific BAC. . . .[I]t is a decrease in your cognitive abilities." (DN 24, at p. 54). Here, however, the United States presented little evidence demonstrating a decrease in Ms. Wallace's cognitive abilities.

Lieutenant Short testified that, initially, Ms. Wallace did not exhibit "typical indicators of a person who is impaired." (DN 22, at pp. 24-25). She was able to exit the vehicle without issue, her speech was not slurred, and she was able to communicate with Lieutenant Short effectively. (*Id*. at pp. 15-16, 24, 54). Further, while performing the HGN test, Ms. Wallace did not exhibit any clues of impairment. (*Id*. at p. 21). This is compelling evidence because Lieutenant Short, retired

12

Louisville Police Officer Raymond Sutherland, and Dr. Plotnick, a licensed toxicologist and attorney, all testified that the HGN test is the most reliable of the three SFSTs. (*Id.* at pp. 50, 52, 58; DN 24, at pp. 10, 49-50). Raymond Sutherland took it one step further, stating that in his expert opinion, "every drunk driver shows some type of clue on HGN," and if an individual shows no clues on the HGN then the SFSTs should be terminated. (DN 24, at p. 13).

With regards to the other two SFSTs Ms. Wallace performed, the Court notes a few issues that call into question the reliability of those results. First, Lieutenant Short admitted that he administered the SFSTs out of order despite knowing that "it's fairly important to maintain the order[.]" *See* (DN 22, at p. 46). Raymond Sutherland opined that by administering the PBT before the final two SFSTs, Lieutenant Short was possibly biased by those results, which is why officers are typically instructed to complete all three SFSTs before moving on to the PBT. (DN 24, at pp. 9-10, 18). Second, the record reflects that Ms. Wallace only had issues with her motor skills once she removed her shoes. *See* (DN 22, at pp. 25-27). Lieutenant Short testified that ordinarily an individual should complete both the walk and turn test and the one-leg stand test while wearing shoes, but in this case Ms. Wallace was asked to remove her shoes because the two-inch heel of her boot would have made it difficult for Lieutenant Short to evaluate her ability to balance. (*Id.* at p. 25). It is unclear what, if any, effect removing her shoes may have had on Ms. Wallace's ability to perform the final two SFSTs. However, both Lieutenant Short and Ms. Wallace indicated that there were rocks on the road.[5] (DN 22, at p. 56; DN 24. at p. 28).

Finally, the United States argued that it proved Ms. Wallace was under the influence of alcohol because she "admitted to drinking" and had a blood alcohol level of 0.078. (DN 24, at p.

---

[5] When asked if Ms. Wallace displayed any discomfort once she removed her shoes Lieutenant Short stated "No, sir. I think there was one point she wiped the bottom of her foot, maybe 'cause a rock was on her sock[.]" (DN 22, at p. 56).

13

55). As stated above, however, mere consumption should not be equated with being "under the influence" of alcohol. *See Bridges*, 845 S.W.2d at 541. And, in relation to Ms. Wallace's blood alcohol results, KRS § 189A.010(3)(b) provides the Court with guidance on how to weigh those results: "[i]f there was an alcohol concentration of 0.04 or greater but less than 0.08. . . that fact shall not constitute a presumption that the defendant either was or was not under the influence of alcohol, but that fact may be considered, together with other competent evidence, in determining the guilt or innocence of the defendant." Therefore, the Court cannot simply take the fact that Ms. Wallace admitted to drinking coupled with her blood alphol level as conclusive proof that she was "under the influence" of alcohol. Rather, the Court must consider this evidence in relation to all the evidence presented.

The Court also notes that there is no evidence of impaired driving in this case. Here, the only evidence before the Court concerning Ms. Wallace's driving ability on the night in question comes from Ms. Bell and Ms. Stallard who both testified that Ms. Wallace did not show any signs of being "under the influence" while driving the vehicle. (DN 22, at pp. 145, 147, 156). Their statements are supported by the fact that Ms. Wallace did not appear to have any issue parking the vehicle. While it is not necessary for the United States to show proof of impaired driving, it is persuasive. *See Hayden v. Commonwealth,* 766 S.W.2d 956, 956-57 (Ky. Ct. App. 1989) (explaining that KRS 189A.010(1), concerning driving while under the influence of alcohol, would "be redundant if read so as to require proof not only that the defendant was under the influence of alcohol but also that alcohol impairs one's driving ability."); *see also Commonwealth v. Wirth*, 936 S.W.2d 78, 80 (Ky. 1996) ("Subsection (b) . . . broadly deals with the effect of alcohol on the motor vehicle operator and is usually proven by evidence of aberrant driving behavior.").

Here, the United States is tasked with proving beyond a reasonable doubt that Ms. Wallace

operated or was in physical control of a motor vehicle while under the influence of alcohol on Fort Knox, Kentucky on or about November 9, 2019. Beyond a reasonable doubt is a very high standard to meet, and in this case, the undersigned finds that the evidence presented leaves the trier of fact with doubt that Ms. Wallace was "under the influence" of alcohol to the extent prohibited by KRS § 189A.010(1)(b). Thus, the Court finds that the evidence as a whole does not support conviction and finds Ms. Wallace not guilty of the charged offense.

## ORDER

**IT IS THEREFORE ORDERED** that Defendant Wallace's objection to Dr. Stephens' qualification as an expert witness in the fields of toxicology and human performance is **SUSTAINED.**

**IT IS FURTHER ORDERED** that based on the evidence presented at trial, the United States failed to prove each and every element of the offense charged beyond a reasonable doubt. Defendant Wallace is, therefore, found **NOT GUILTY** of the charged offense.

*Regina S. Edwards, Magistrate Judge*
*United States District Court*

July 14, 2021

Copies: Counsel of Record